BUREAU MARKETING SERVICE et al., Plaintiffs, Appellees, v. J. H. LEWIS, Receiver, et al., Defendants; FIRST NATIONAL BANK of Chicago, Defendant, Appellant.

DR. J. D. SHIVELY, Plaintiff, Appellee, v. J. H. LEWIS, Receiver, et al., Defendants; FIRST NATIONAL BANK of Chicago, Defendant, Appellant.

No. 42962.

October 23, 1935.

O. M. Slaymaker, for appellees.

Strock, Sloan & Dyer, for appellant.

PARSONS, J.—This appeal is in two cases, consolidated and tried together as equity cases in the district court of Clarke county, Iowa, one being entitled Bureau Marketing Service of Osceola, Iowa, and Mrs. E. E. Agans v. Receiver of Simmons & Co., Bankers of Osceola, Iowa, and First National Bank of Chicago; the other case was entitled J. D. Shively and against the same defendants. For convenience, the two cases will be hereafter called the Bureau Marketing Service case and the Shively case.

The cases grew out of the insolvency of Simmons & Co. bankers of Osceola, Iowa. Simmons & Co. was a private bank, owned by a copartnership, which did business in Osceola, Iowa, for a number of years prior to December 10, 1930. On the last-named date a receiver was appointed for Simmons & Co., and the bank ceased existence as a going concern.

The Bureau Marketing Service of Osceola was a corporation organized for the purpose of marketing the live stock of its members, and on the 5th day of December, 1930, the packing company gave to the marketing bureau for live stock purchased of it a check reading,

"The Iowa Packing Company, #5763
    "Des Moines, Iowa 12–5–30
    "Pay One Thousand Twenty Seven and
23/100 Dollars $1,027.23
"To the Order Of Bureau Mkt. Service, Osceola, Iowa
                    "The Iowa Packing Company
                    "Per A. Freed
"To Central National Bank and Trust Co., Des Moines, Iowa."

This check was carried by the marketing service until the 8th day of December, 1930, when it was taken to the Simmons & Co. bank and delivered to it, and was credited in the passbook of the Bureau Marketing Service, as a deposit. The check was taken to the bank by E. E. Agans, who, with his wife, Esther Agans, operated the affairs of the corporation, she being the manager. It is claimed by the Bureau Marketing Service that Mr. Agans had a talk with A. D. Simmons of the banking firm as to what they were doing, and how the business was conducted.

That he told Paul Simmons, one of the banking firm, the nature of the marketing concern; that it was a cooperative concern, organized to sell the live stock of the members; and that it distributed the money received for livestock after it came in, and that all of the money belonged to the shipping association, and that the Bureau Marketing Service just had it in trust; that the Bureau Marketing Service's interest in it was as it had taken up obligations; and that he (Agans) had handled the transaction of the particular check involved with Lloyd and Paul Simmons, who were partners in the bank.

It further appears in evidence that Simmons & Co., as bankers, were country correspondents with the First National Bank of Chicago, sending any items to the Chicago bank to be credited on its account, and drawing checks and drafts against the account in the Chicago bank. The check in question of the Iowa Packing Company was taken to the Simmons bank December 8th, between 4 and 5 o'clock p. m., closing time of the bank being 4 o'clock p. m., and it was by Mr. Agans given to the bank and was entered on the passbook as a deposit at that time. Simmons & Co. in sending the items to the Chicago bank sent them upon letters with printed head as follows:

"Simmons & Co., Bankers

"Osceola, Iowa _____19_____

"_____

"_____

"Enclosed find for collection and credit. Protest all Items Over $10.00 unless marked X before items.

"Simmons & Co.

"On                 Amount

_____      _____"

On the same day it received the check, the Simmons bank sent four letters of credit to the Chicago bank, listing various items sent, and among the items was listed this check for $1,-027.23. Upon receipt of these items at the Chicago bank, the Simmons bank was given credit, in accordance with the custom between these two banks, and a special custom between banks having such relations, with the full amount of the items listed, which were received in Chicago, in this instance, on the 9th of December. The book balance credit of Simmons & Co. in the Chicago bank at the close of business December 8, 1930, and at

the opening of busines December 9th, was $3,929.83. On December 9th, the Chicago bank credited the Simmons bank with $10,-433.56, by reason of such remittances, and amongst the items included was the Iowa Packing Company check for $1,027.23. These items, of course, when received by the Chicago bank, would be forwarded for collection so as to reach the various institutions upon which they were drawn. So, taking out the uncollected cash letter items, instead of a book balance of credit to the Simmons & Co. bank of $2,094.47 at the close of business December 9th, there was no actual balance, but an actual overdraft of $4,051.88, the Chicago bank having cashed Simmons & Co. drafts on December 9th in the total amount of $12,423.91. These items were all cashed, relying upon all items both collected and uncollected received from Simmons & Co., including their cash letters of the 8th and 9th. During the day of December 10th, the Chicago bank received the $535 check involved in the Shively case, and many other items in two cash letters, $4,062.18 of which eventually proved to be uncollected, so that there was an overdraft of $4,051.88 at the close of business on December 10, 1930. During the day the Chicago bank cashed $2,913.01 of the drafts of Simmons & Co. on that account, and made a charge of $600 for a matured rediscount, so that the total debit charges to the account that day were $3,513.08, and in cashing these items relied upon the Simmons & Co. cash letters received on the 10th, which included the Shively check, as well as the account as it stood on the books of the Chicago bank. These cash letters of Simmons & Co. were all of the same form and same construction as all such letters over a period of years prior to December 10, 1930, and the account was handled both as to items coming in and going out during all this time in the same manner, and it was the practice and relationship between these banks that the Chicago bank cashed the Simmons & Co. drafts collected and uncollected up to their book balance.

The Simmons & Co. bank was closed by the appointment of a receiver about 7:30 o'clock the morning of December 10, 1930. The notice of such appointment was received in the country bank correspondents' department about 3:05 p. m. of December 10, 1930. The business of the Chicago bank for that day had been closed since 2 o'clock, so that at the close of the business on that day there was this large actual overdraft of the Simmons & Co. bank of $4,051.88.

The district court of Clarke county, Iowa, early in the morning of December 10th, signed an order placing the Simmons & Co. bank and its copartners in receivership, and the receiver at once qualified and took possession of the assets and affairs of the Simmons & Co. bank. This was not on the application of the banking department, but on the application of a private individual, hence probably the notices to the parties interested, such as to corresponding banks, would not be sent out as rapidly as if under the banking department, and on the failure of Simmons & Co., the Bureau Marketing Service stopped payment on this check, E. E. Agans testifying: "I learned the bank had closed about 8:30 A. M. December 10th, and immediately called Iowa Packing Company and asked them to stop payment on the check, which it did."

■■■ The appellant in the argument in the Bureau Market Service case takes the position that the indorsement of the check is insufficient. The check was made payable to "Bureau Mkt. Service Osceola, Iowa." It was indorsed "Bureau Marketing Service, Esther Agan". In looking at the copy of the exhibit, there may be an "s" on the end of "Agan". The proper name of the corporation to which the check was issued was, according to the articles of incorporation, "Bureau Marketing Service". E. E. Agans and his wife, Esther Agans, were the managers of the corporation. The check was sent by the Iowa Packing Company, or delivered, to the corporation, Bureau Marketing Service, so the check was belonging only to that corporation. No one familiar with the name could doubt that the abbreviation "Mkt." in the check, in the connection written, would make the check read "Bureau Marketing Service", and as the corporation was located at Osceola, Iowa, the addition of the words "Osceola, Iowa" would assist further in the identification of the corporation. And that the name "Esther Agan" was attached thereto makes no difference on the indorsement, as the check bore the name of the corporation on the back, "Bureau Marketing Service", and was simply followed by the name "Esther Agan". True, it does not have the word "by" before the name "Esther Agan", but the indorsement alone written across the back of the check "Bureau Marketing Service" prima facie was sufficient to make the complete indorsement of the check. The courts have had something to say about this. In Second National Bank v. Martin, 82 Iowa 442, 48 N. W. 735, a note involved in

that suit was made payable to Gaar, Scott & Co. "with nothing whatever to show by whom it was written." It was insisted by the defendant that the indorsement was invalid for the reason that the indorser is a corporation authorized to execute the indorsement only by signature of its proper officers, either alone or in connection with the name of the corporation. The court in its opinion said, on page 444:

"The name of the corporation written on the back of the instrument is in fact the signature of the indorser, just as it would be if it were shown that it was made by an officer of the corporation that signs it. It is the corporation that does the act by the officer, for it has not hands, and cannot write. When the name is found written upon the notes, it is known that it is intended as the indorsement in blank", and the indorsement was thus held sufficient.

An examination of the indorsement on the back of the note shows that the name of the corporation was written by the same hand that wrote the name "Esther Agan" just beneath the name of the corporation. There is in this case the presentation of this check by E. E. Agans, one of the managers of the corporation, with the indorsement thereon as before set forth. E. E. Agans testified as to the indorsement thereon, "Bureau Marketing Service, Esther Agan", being in the handwriting of his wife, Esther Agans. There can be no question that this check in this form, indorsed as it was in the handwriting of a general managerial officer of the corporation and presented by an officer of the corporation to the bank for deposit, was sufficient to transfer to the Simmons bank all the right, title, and interest of the Bureau Marketing Service in the check; and being an indorsement without restrictions, it made the paper payable as though it were originally made payable to bearer, and such paper passes from hand to hand by delivery. So, the check being sent in by the Simmons bank to the Chicago bank for credit, bearing this indorsement, with request to credit, there was nothing else the Chicago bank could do, until it received some notice to the contrary, but to credit the same to the account of the Simmons bank. This it did.

Had it been the intention of the Bureau Marketing Service to deposit this check for collection only, it could have done so by adding to its indorsement "For collection only", or words to that effect. Then the apparent title would not have passed to

Simmons & Co., but into whosesoever hands the check might come there was notice that it was for collection only, and the Chicago bank would have had no right to have treated it otherwise.

Blacher v. National Bank of Baltimore, decided by the Maryland Court of Appeals December 1, 1926, reported in 151 Md. 514, 135 A. 383, 49 A. L. R. at page 1366, holds that "the rule that mere possession by an agent of his principal's property is not sufficient evidence, either of title in the agent, or of his authority to dispose of it, has an exception when the property is negotiable." This case states on page 1370 of 49 A. L. R.:

"Instead of indorsing the checks restrictively (i.e., for collection) and thereby assuring that all subsequent indorsees would acquire only the title of his first indorser under the restrictive indorsement, the payee of the checks indorsed them in blank, and by his election became liable as an indorser who indorses without qualification. * * * And the indorsement in blank by Bernstein, Cohen & Co. was a guaranty that it had a clear title to the three checks it indorsed, supra. Under such circumstances, the appellee was not bound to make inquiry of Bernstein, Cohen & Co. if it held the checks as agent or in any other way than as owner." Further in this case, on page 1371, the opinion says: "The payee of a check can protect his own rights by the form of his indorsement. If he neglects his own interest and indorses in blank instead of restrictively, and thereby enables his agent for collection to use the paper as its own, the loss occasioned by the title to the negotiable paper not being in the agent should be borne by the payee, whose own improvident act afforded the agent an opportunity to transfer the negotiable paper pursuant to its purport. Innocent subsequent parties should not suffer for reliance upon a negotiable instrument and its indorsement according to their tenor. The rule adopted has the merit of affording such parties the protection of the negotiable paper according to its terms, and finds support in its tendency to protect the integrity of negotiable paper and to give greater security to financial transactions by the assurance that the law will commonly give to checks and other negotiable paper the effect ascribable to their form and content."

The note to this case, in 49 A. L. R. beginning on page 1373, cites the United States Supreme Court, the courts of last resort of Colorado, Illinois, Indiana, Maryland, Massachusetts, Mich-

igan, Mississippi, Missouri, New York, North Carolina, Oklahoma, Pennsylvania, and West Virginia, and the cases cited fully support the doctrine laid down in the opinion. To the same effect is Italian American Bank of Denver v. Carosella, 81 Colo. 214, 254 P. 771, 58 A. L. R. 250, with a note beginning at page 259.

A bank acting as a correspondent bank, who receives negotiable instruments from one apparently clothed with title thereto, and credits the amount of the proceeds, and then honors checks or drafts against such deposit, or applies the same on an overdraft or other indebtedness due it, or parts with securities, or in any way makes itself liable for the amount of the deposit, outside of the obligation carried by the mere deposit, on the faith of the instrument, is holding of the instrument for value. President of Board of Directors of the Bank of the Metropolis v. New England Bank, 1 How. 234, 11 L. Ed. 115; Marion National Bank v. Harden, 83 W. Va. 119, 97 S. E. 600, 16 A. L. R. 240; National Bank of Commerce v. Morgan, 207 Ala. 65, 92 So. 10, 24 A. L. R. 897; Old National Bank of Spokane v. Gibson, 105 Wash. 578, 179 P. 117, 6 A. L. R. 247; Elk Valley Bank v. State Road Commissioners, 111 W. Va. 527, 162 S. E. 889, 80 A. L. R. 1061; City Deposit Bank v. Green, 130 Iowa 384, 106 N. W. 942.

The Bank of the Metropolis v. New England Bank, 1 How. 234, 11 L. Ed. 115, holds that where there had been mutual and extensive dealings between two banks, and an account current between them, in which they mutually credited each other with the proceeds of all paper remitted for collection when received, and charged all costs of protest, postage, etc., accounts were regularly transmitted from the one to the other, and settled upon these principles; and upon the face of the paper transmitted, it always appeared to be the property of the respective banks, and to be remitted by each of them on its own account, and it was held there is a lien for a general balance of accounts upon the paper thus transmitted, no matter who may be its real owner. The opinion says:

"It has been long settled, that wherever a banker has advanced money to another, he has a lien on all the paper securities which are in his hands for the amount of his general balance, unless such securities were delivered to him under a particular agreement." And further says, "The possession of the

paper was prima facie evidence that it was the property of the last-mentioned bank [that being the bank sending in the item] ; and without notice to the contrary, the plaintiff in error had a right so to treat it, and was under no obligation to inquire whether it was held as agent or as owner; and if an advance of money had been made upon this paper to the Commonwealth Bank, the right to retain for that amount would hardly be disputed.'' It then holds, ''We do not perceive any difference in principle between an advance of money and a balance suffered to remain upon the faith of these mutual dealings. In the one case as well as the other, credit is given upon the paper deposited or expected to be transmitted in the usual course of the transactions between the parties.'' And further points out, ''if the accounts show that it was their practice and understanding to allow them to stand and await the collection of the paper remitted, the rights of the parties are the same as if there had been a positive and express agreement; and such mutual indulgence on these balances would be a valid consideration; and like the actual advance of money give the plaintiff in error a right to retain the amount due on closing the account.'' The opinion further held that where it is evident a loss must be sustained by one or the other, ''we see no ground for maintaining that there is any superior equity on the side of the New England Bank [that being the remitting bank]. It contributed to give to the corporation which has proved insolvent credit with the plaintiff in error, by the notes and bills which it placed in its hands to be sent to Washington for collection, endorsed in such a form as to make them prima facie the property of the Commonwealth Bank, and enabled it to deal with them as if it were the real owner. * * * And when this misplaced confidence has occasioned the loss in question, it would be unjust to throw it upon the bank which has been guilty of no fault or want of caution, and which was induced to give the credit by the manner in which the defendant in error placed its property in the hands of an agent unworthy of the trust.''

In City Deposit Bank v. Green, 130 Iowa 384, 106 N. W. 942, it is held that a bank which discounts a note for a depositor, simply giving him credit for the proceeds in his account, is not a *bona fide* holder so long as the credit exists; but if the depositor was indebted to the bank at the time in an amount equal to the

proceeds or withdraws the deposit before maturity of the note and notice to the bank of any infirmity therein, it would then become a *bona fide* holder.

In Mynster v. Baker, 215 Iowa 456, 245 N. W. 722, it is held:

"One who executes a negotiable promissory note to his agent under an agreement that the agent will sell the note and with the proceeds discharge an existing mortgage on the principal's property, runs the risk that the agent may, in discharge of his own debt, transfer the note, before due, to a bona fide holder."

The principles of these last two decisions are in reference to the rule that when he makes a situation of the kind here possible, such as was made by the Simmons bank sending the packing company check to Chicago for credit, it takes the chance of this being done. So that when the Bureau Marketing Service indorsed the check as it did in blank, and intrusted it to the Simmons bank, and the Simmons bank sent it to Chicago to credit, it cannot now complain because its action made it possible for the Chicago bank to treat the check as it did treat it; i. e., as the property of the Simmons bank.

So, as a result, the proposition that a bank which receives from one for deposit a check apparently payable to the depositor, either by being payee or indorsee or the holder of an instrument indorsed so as to make it payable to bearer, is a purchaser in good faith where it has paid out prior to·receiving notice of any infirmity in the title of the one presenting it on account of the credit so given an amount equal to or in excess of the amount of the deposit, including the check so received. And this proposition is fully supported by the authority cited, and is the law not only of the state of Iowa, but by the decisions of the different state and federal courts. So as it appears in this case, the Simmons bank sent to the Chicago bank the Iowa Packing Company check which was credited on the books of the Chicago bank to the Simmons bank on the 9th day of December, 1930, and it never received notice of any claimed infirmity in the title of the Simmons bank to the check until after the close of business on the 10th, and that the state of its account was such that when the different items sent to it had been returned the account was largely overdrawn. The Chicago bank became clothed with the title to the check, could maintain an action thereon, and had

the right to the proceeds thereof. This being so, we must necessarily hold in reference to the Iowa Packing Company check of $1,027.23 that the indorsement by the Bureau Marketing Service was regular; that it was in blank and the check became payable to bearer thereby; and that when the Simmons bank sent this check to the Chicago bank, the Chicago bank had the right to credit to the Simmons account, and had a lien on and a right to hold all in that account on obligations it had incurred prior to receiving notice of the closing of the Simmons bank; and that such notive was not so received. Hence the check became and is the property of the Chicago bank.

What we have said heretofore applies with equal force to the Shively check, being a check for $535. This is negotiable in form. It is dated October 13, 1930. It was turned over to the Simmons bank December 9, 1930. During the forenoon of the day that the receiver was appointed, Shively got in touch with the bank upon which it was drawn, the First National Bank of Bloomington, Ill., to stop payment of the check. No notice of the receivership was received by the Chicago bank until 3:05 p. m., after the bank had closed business for the day, and during the day it had paid out drafts and checks of the Simmons bank so as to make an overdraft. It is claimed that from October 13th to December 9th was an unreasonable time to carry the check. It was. In times such as existed then, as we look back now, we can say that whoever carried the check that length of time, and under circumstances then existing, was acting foolishly.

These lawsuits as between both plaintiffs and the Chicago bank are not between the makers of the checks and the bank, but between the Chicago bank and the indorsers of the checks, who, of their own volition, clothed the Simmons bank with the indicia of the ownership in question, and the Chicago bank in reliance upon these paid out enough money to more than absorb the sum of the two checks. Hence, the Chicago bank stands in a different position than it would otherwise stand.

Amthauer v. Johnson, Kansas, 138 Kan. 729, 27 P.(2d) 241, is a case which arose in Idaho, but the legal question presented in that case was the liability to his transferee of one who, for value, sells and indorses a past-due promissory note, appellants contending that the plaintiff was not a "holder in due course", as that term is defined in the Negotiable Instruments Act, in our Code being section 9467, reading,

"An instrument is payable on demand: 1. Where it is expressed to be payable on demand, or at sight, or on presentation; or 2. In which no time for payment is expressed. Where an instrument is issued, accepted, or indorsed when overdue, it is, as regards the person so issuing, accepting, or indorsing it, payable on demand."

Quoting from the opinion, the court said, on page 241:

"The point would be well taken if the action here were against the maker of the note," citing authorities, and then says, "But this is not an action against the maker of the note. It is an action by an indorsee against the indorser to him of an overdue note."

It then points out that prior to the adoption of our Negotiable Instruments Law, it was the rule of the law merchants and the rule in this state that one who sold and indorsed a promissory note after its maturity date, as between himself and the transferee, reissued the instrument as one payable on demand, and gave the rule as embodied in our Negotiable Instruments Law, section 9467 Iowa Code. Further, section 9657 of our Negotiable Instruments Law provides:

"In any case not provided for in this chapter, the rules of the law merchant shall govern." The rule cited, of course, was a rule under the law merchant.

Idaho State Bank v. Hooper Sugar Co., 74 Utah 24, 276 P. 659, 68 A. L. R. 969, is a case wherein amongst the questions involved was a note discounted by the National City Bank, which was overdue when received. One Wright was an indorser, and the court says, on page 665:

"When Wright indorsed the note after maturity, he gave it a second maturity date as to him, namely, a reasonable time after the transfer." And the court says as to this, "Even though it should be conceded that the Hooper Sugar Company note was overdue as to both Wright and the Hooper Sugar Company when it was received by plaintiff, such fact standing alone does not aid Wright in his claim that he is still the owner and entitled to the possession of such note. Wright deliberately vested Frank Pingree with all the indicia of ownership, and having done so, he may not be heard to claim as against a bona fide holder for value that he did not part with title," citing a num-

ber of authoritites. It says further, "The same rule has been applied to nonnegotiable promissory notes", citing 1 Joyce, Defenses to Commercial Paper (2d Ed.) section 571, p. 170, also an article in 31 Harvard Law Review 1104. This rule which we speak of is not a rule confined to commercial paper, but also to negotiable and nonnegotiable paper. A little reflection would convince one that such is true. A, the owner of an auto, clothed B with the indicia of ownership. B sells the auto to C and disappears and takes the money with him. Could A sue C and reclaim the auto after B had thus sold it and appropriated the money?

There is another contention in this case, and that is that after the failure of the Simmons bank the Chicago bank charged these items out of its account and filed a claim against the receiver of the Simmons bank. It was its duty so to do, and thus minimize its loss. If by so doing it could have collected more than was coming to it, it might have been called to account by the plaintiffs herein, or others holding similar claims. We can see no element of estoppel, no element of election of remedies, such as to bar the Chicago bank in this litigation.

So, on the whole case, we conclude that the First National Bank of Chicago is the owner of the two checks in controversy herein, and that the judgment of the court below must be reversed; and that the Chicago bank is entitled to a decree that it is the owner. As this case is the result of consolidation of two cases, the costs in this court should be divided between plaintiffs, the Bureau Marketing Service paying 75 per cent of the costs, and Shively paying 25 per cent of the costs, such costs to be so taxed. The First National Bank of Chicago may have a decree entered in this court in accordance with the foregoing, or the same may be sent back to the district court of Clarke county to enter a decree as provided herein. As these cases are in equity, the First National Bank of Chicago, if it elects, may have the decree entered here.

We think that all the matters controlling have been herein discussed, although many other matters have been argued, but they are not necessary to the determination of this case. So, for the reasons pointed out, the decree of the district court of Clarke county in this matter is reversed.—Reversed.

KINTZINGER, C. J., and ALBERT, DONEGAN, HAMILTON, and RICHARDS, JJ., concur.